# FITZGERALD, TREASURER OF IOWA *v.* RACING ASSOCIATION OF CENTRAL IOWA ET AL.

No. 02–695.   Argued April 29, 2003—Decided June 9, 2003

BREYER, J., delivered the opinion for a unanimous Court.

*Thomas J. Miller*, Attorney General of Iowa, argued the cause for petitioner. With him on the briefs were *Julie F. Pottorff*, Deputy Attorney General, and *Jeffrey D. Farrell* and *Jean M. Davis*, Assistant Attorneys General.

*Kent L. Jones* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General O'Connor, David English Carmack*, and *Judith A. Hagley*.

*Mark McCormick* argued the cause for respondents. With him on the brief were *Thomas L. Flynn, Edward M. Mansfield, Stephen C. Krumpe*, and *Lawrence P. McLellan*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Missouri et al. by *Jeremiah W. (Jay) Nixon*, Attorney General of Missouri, *James R. Layton*, State Solicitor, *Alana M. Barragán-Scott*, Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *William H. Pryor, Jr.*, of Alabama, *Michael A. Cox* of Michigan, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Patricia A. Madrid* of New Mexico, *Anabelle Rodríguez* of Puerto Rico, *Larry Long* of South Dakota, *Paul G. Summers* of Tennessee, and *William H. Sorrell* of Vermont; and for the City of Bettendorf, Iowa, et al. by *Thomas D. Waterman, Dennis W. Johnson*, and *Robert N. Johnson III*.

Briefs of *amici curiae* urging affirmance were filed for the City of Dubuque, Iowa, by *Barry A. Lindahl;* for Polk County, Iowa, by *John P. Sarcone;* and for the Institute for Justice by *Clint Bolick, William H. Mellor, Dana Berliner*, and *Clark M. Neily*.

JUSTICE BREYER delivered the opinion of the Court.

Iowa taxes adjusted revenues from slot machines on excursion riverboats at a maximum rate of 20 percent. Iowa Code § 99F.11 (2003). Iowa law provides for a maximum tax rate of 36 percent on adjusted revenues from slot machines at racetracks. §§ 99F.4A(6), 99F.11. The Iowa Supreme Court held that this 20 percent/36 percent difference in tax rates violates the Federal Constitution's Equal Protection Clause, Amdt. 14, § 1. 648 N. W. 2d 555 (2002). We disagree and reverse the Iowa Supreme Court's determination.

I

Before 1989, Iowa permitted only one form of gambling—parimutuel betting at racetracks—the proceeds of which it taxed at a six percent rate. Iowa Code § 99D.15 (1984). In 1989, it authorized other forms of gambling, including slot machines and other gambling games on riverboats, though it limited bets to $5 and losses to $200 per excursion. 1989 Iowa Acts ch. 67, §§ 3, 9(2); Iowa Code § 99F.3 (1996). Iowa taxed adjusted revenues from slot machine gambling at graduated rates, with a top rate of 20 percent. 1989 Iowa Acts ch. 67, § 11; Iowa Code § 99F.11 (1996).

In 1994, Iowa enacted a law that, among other things, removed the riverboat gambling $5/$200 bet/loss limits, 1994 Iowa Acts ch. 1021, § 19, authorized racetracks to operate slot machines, § 13; Iowa Code §§ 99F.1(9), 99F.4A (1996), and imposed a graduated tax upon racetrack slot machine adjusted revenues with a top rate that started at 20 percent and would automatically rise over time to 36 percent, 1994 Iowa Acts ch. 1021, § 25; Iowa Code § 99F.11 (1996). The Act did not alter the tax rate on riverboat slot machine adjusted revenues, thereby leaving the existing 20 percent rate in place. *Ibid.*

Respondents, a group of racetracks and an association of dog owners, brought this lawsuit in state court challenging the 1994 legislation on the ground that the 20 percent/36 per-

cent tax rate difference that it created violated the Federal Constitution's Equal Protection Clause, Amdt. 14, § 1. The State District Court upheld the statute. The Iowa Supreme Court disagreed and, by a 4-to-3 vote, reversed the District Court. The majority wrote that the "differential tax completely defeats the alleged purpose" of the statute, namely, "to help the racetracks recover from economic distress," that there could "be no rational reason for this differential tax," and that the Equal Protection Clause consequently forbids its imposition. 648 N. W. 2d, at 560–562. We granted certiorari to review this determination.

## II

Respondents initially claim that the Iowa Supreme Court's decision rests independently upon state law. And they argue that this state-law holding bars review of the federal issue. We disagree. The Iowa Supreme Court's opinion, after setting forth the language of both State and Federal Equal Protection Clauses, says that "Iowa courts are to 'apply the same analysis in considering the state equal protection claims as . . . in considering the federal equal protection claim.'" Id., at 558. We have previously held that, in such circumstances, we shall consider a state-court decision as resting upon federal grounds sufficient to support this Court's jurisdiction. See Pennsylvania v. Muniz, 496 U. S. 582, 588, n. 4 (1990) (no adequate and independent state ground where the court says that state and federal constitutional protections are "'identical'"). Cf. Michigan v. Long, 463 U. S. 1032, 1041–1042 (1983) (jurisdiction exists where federal cases are not "being used only for the purpose of guidance" and instead are "compel[ling] the result"). We therefore find that this Court has jurisdiction to review the Iowa Supreme Court's determination.

## III

We here consider whether a difference in state tax rates violates the Fourteenth Amendment's mandate that "[n]o

State shall . . . deny to any person . . . the equal protection of the laws," § 1. The law in question does not distinguish on the basis of, for example, race or gender. See, *e. g., Loving* v. *Virginia,* 388 U. S. 1 (1967); *United States* v. *Virginia,* 518 U. S. 515 (1996). It does not distinguish between instate and out-of-state businesses. See, *e. g., Metropolitan Life Ins. Co.* v. *Ward,* 470 U. S. 869 (1985). Neither does it favor a State's long-time residents at the expense of residents who have more recently arrived from other States. Cf. *Hooper* v. *Bernalillo County Assessor,* 472 U. S. 612 (1985). Rather, the law distinguishes for tax purposes among revenues obtained within the State of Iowa by two enterprises, each of which does business in the State. Where that is so, the law is subject to rational-basis review:

> "[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger* v. *Hahn,* 505 U. S. 1, 11–12 (1992) (citations omitted).

See also *id.,* at 11 (rational-basis review "is especially deferential in the context of classifications made by complex tax laws"); *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522, 527 (1959) (the Equal Protection Clause requires States, when enacting tax laws, to "proceed upon a rational basis" and not to "resort to a classification that is palpably arbitrary").

The Iowa Supreme Court found that the 20 percent/36 percent tax rate differential failed to meet this standard because, in its view, that difference "frustrated" what it saw as the law's basic objective, namely, rescuing the racetracks from economic distress. 648 N. W. 2d, at 561. And

no rational person, it believed, could claim the contrary. *Id.*, at 561–562.

The Iowa Supreme Court could not deny, however, that the Iowa law, like most laws, might predominantly serve one general objective, say, helping the racetracks, while containing subsidiary provisions that seek to achieve other desirable (perhaps even contrary) ends as well, thereby producing a law that balances objectives but still serves the general objective when seen as a whole. See *Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 181 (1980) (STEVENS, J., concurring in judgment) (legislation is often the "product of multiple and somewhat inconsistent purposes that led to certain compromises"). After all, if *every* subsidiary provision in a law designed to help racetracks had to help those racetracks and nothing more, then (since any tax rate hurts the racetracks when compared with a lower rate) there could be no taxation of the racetracks at all.

Neither could the Iowa Supreme Court deny that the 1994 legislation, *seen as a whole,* can rationally be understood to do what that court says it seeks to do, namely, advance the racetracks' economic interests. Its grant to the racetracks of authority to operate slot machines should help the racetracks economically to some degree—even if its simultaneous imposition of a tax on slot machine adjusted revenues means that the law provides less help than respondents might like. At least a rational legislator might so believe. And the Constitution grants legislators, not courts, broad authority (within the bounds of rationality) to decide whom they wish to help with their tax laws and how much help those laws ought to provide. "The 'task of classifying persons for . . . benefits . . . inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line,' and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Id.*, at 179 (citation omitted). See also *ibid.* (judicial review is "at

an end" once the court identifies a plausible basis on which the legislature may have relied); *Nordlinger, supra,* at 17–18.

Once one realizes that not every provision in a law must share a single objective, one has no difficulty finding the necessary rational support for the 20 percent/36 percent differential here at issue. That difference, harmful to the racetracks, is helpful to the riverboats, which, as respondents concede, were also facing financial peril, Brief for Respondents 8. See also 648 N. W. 2d, at 557. These two characterizations are but opposite sides of the same coin. Each reflects a rational way for a legislator to view the matter. And aside from simply aiding the financial position of the riverboats, the legislators may have wanted to encourage the economic development of river communities or to promote riverboat history, say, by providing incentives for riverboats to remain in the State, rather than relocate to other States. See Gaming Study Committee Report (Sept. 3, 1993), reprinted in App. 76–84, 86. Alternatively, they may have wanted to protect the reliance interests of riverboat operators, whose adjusted slot machine revenue had previously been taxed at the 20 percent rate. All these objectives are rational ones, which lower riverboat tax rates could further and which suffice to uphold the different tax rates. See *Allied Stores, supra,* at 528; *Nordlinger, supra,* at 12. See also *Madden* v. *Kentucky,* 309 U. S. 83, 88 (1940) (imposing burden on respondents to "negative every conceivable basis" that might support different treatment).

Respondents argue that *Allegheny Pittsburgh Coal Co.* v. *Commission of Webster Cty.,* 488 U. S. 336 (1989), holds to the contrary. Brief for Respondents 21. In that case, the Court held that substantial differences in the level of property tax assessments that West Virginia imposed upon similar properties violated the Federal Equal Protection Clause. But the Court later stated, when it upheld in *Nordlinger* a California statute creating similar differences in property taxes, that "an obvious and critical factual difference be-

tween this case and *Allegheny Pittsburgh* is the absence of any indication in *Allegheny Pittsburgh* that the policies underlying an acquisition-value taxation scheme could conceivably have been the purpose for the . . . unequal assessment." 505 U. S., at 14–15. The Court in *Nordlinger* added that "*Allegheny Pittsburgh* was the rare case where the facts precluded any plausible inference that the reason for the unequal assessment practice was to achieve the benefits of an acquisition-value tax scheme." *Id.*, at 16–17, and n. 7. Here, "the facts" do not "preclud[e]" an inference that the reason for the different tax rates was to help the riverboat industry or the river communities. *Id.*, at 16.

## IV

We conclude that there is "a plausible policy reason for the classification," that the legislature "rationally may have . . . considered . . . true" the related justifying "legislative facts," and that the "relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Id.*, at 11. Consequently the State's differential tax rate does not violate the Federal Equal Protection Clause. The Iowa Supreme Court's judgment to the contrary is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*